IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ELECTRONICALLY FILED
Jan 29 2024
U.S. DISTRICT COURT
Northern District of WV

**AMERICAN HOME SHIELD CORPORATION,**

          **Plaintiff,**

v.

Civil Action No.: **3:24-CV-14**
Honorable **Groh**

**ERIE INSURANCE PROPERTY & CASUALTY COMPANY,**

          **Defendant.**

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff American Home Shield Corporation ("AHS" or "Plaintiff"), by and through its undersigned counsel, files this Complaint for Declaratory Judgment against Erie Insurance Property & Casualty Company ("Erie").

### NATURE OF THE ACTION

1. This action is instituted pursuant to the provisions of the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* AHS brings this Complaint to seek a declaration from the Court that Erie owes a duty to defend and a duty to indemnify AHS as an additional insured under Erie Policy Number Q326320095. Specifically, AHS seeks a declaration that Erie is estopped from denying coverage based upon representations of coverage made by Erie in its certificate of insurance, which AHS reasonably relied upon to its detriment. In addition, because Erie has refused to agree to indemnify and defend AHS, AHS seeks damages caused by that refusal.

### THE PARTIES

2. AHS is a Delaware corporation with its principal place of business in Memphis, Tennessee. AHS is authorized to conduct business in West Virginia.

3. Erie is a Pennsylvania corporation with its principal place of business in Erie, Pennsylvania. Erie is authorized to conduct business in West Virginia.

4. Erie is an "insurer" within the meaning of W. Va. Code § 33-1-2 and engages in the business on transacting insurance within the meaning of W. Va. Code § 33-1-1, including the issuance of policies for property, casualty, and commercial liability insurance as defined in W. Va. Code § 33-1-10(e)(2).

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) as the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and there is complete diversity of citizenship between AHS and Erie.

6. In addition, under 28 U.S.C. § 2201, this Court has the power to declare the rights and legal relations of AHS and Erie, with respect to the rights and duties that Erie, under certain insurance contracts and coverages, reflected on a certificate of insurance.

7. This Court also has personal jurisdiction over Erie as it transacts business in West Virginia and issued contracts to insure persons, property, and/or risks located within West Virginia.

8. Venue is proper in the Northern District under 28 U.S.C. § 1391(b)(2), in that substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

9. This action arises as a result of a home explosion that occurred on November 11, 2019 in Jefferson County, West Virginia.

10. It centers on a dispute whereby AHS requested that Erie defend and indemnify AHS as an additional insured for the claims asserted by Jamie Sharp and Gary Sharp (collectively, the

"Sharps") and State Farm Fire & Casualty Company ("State Farm"), as subrogee of the Sharps, against AHS following the explosion of the Sharps' home, as set forth more fully in Consolidated Civil Action No. CC-19-2021-C-159 pending in the Circuit Court of Jefferson County, West Virginia (the "Underlying Actions").

## The Sharps' Complaint

11. The Sharps filed their Complaint on November 10, 2021, wherein they allege the total loss of their personal and residential property and personal injuries following the explosion of their home located at 498 Cloverdale Road, Charles Town, West Virginia 25414. A true and correct copy of the Sharps' Complaint is attached hereto as **Exhibit 1**.

12. According to the Sharps' Complaint, the Sharps were experiencing problems with their propane-fueled furnace and submitted a request for service to AHS under their home warranty plan on November 10, 2019. **Exhibit 1** at ¶¶ 8–9.

13. AHS thereafter dispatched independent service contractor Tenney's Heating and Cooling Services ("Tenney's"), which then dispatched its employee Jesse Ruppenthal ("Mr. Ruppenthal") to the Sharps' home to service the furnace. **Exhibit 1** at ¶ 11.

14. On November 11, 2019, Mr. Ruppenthal arrived at the home and allegedly noticed the odor of propane gas immediately upon his entry into the residence. **Exhibit 1** at ¶¶ 15–16.

15. In the events that followed, Mr. Ruppenthal allegedly proceeded into the basement of the Sharps' home where he opened a sliding gas door which allegedly allowed oxygen to mix with the propane, which caused the explosion. **Exhibit 1** at ¶¶ 21–35.

16. As a result of the explosion, the Sharps allege a complete loss of their home, personal property, as well as personal injuries sustained by Gary Sharp. **Exhibit 1** at ¶¶ 36–37.

17. As it relates to AHS, the Sharps allege that AHS negligently failed to ensure that Tenney's had the proper qualifications, was properly trained to safely service home appliances, or had properly trained its employees, such as Mr. Ruppenthal. **Exhibit 1** at ¶¶ 58–63.

18. The Sharps also allege that AHS is responsible for the wrongful actions of Tenney's under the doctrine of *respondeat superior*. **Exhibit 1** at ¶¶ 64–68.

19. The Sharps' allegations against AHS relate solely to the work of Tenney's and its employee, Mr. Ruppenthal, whose actions are alleged to have caused the explosion.

20. The Sharps' allegations against AHS relate to Tenney's services and obligations, which are governed by the Master Services Agreement entered into between AHS and Tenney's and are subject to the insurance and indemnification provisions set forth in Paragraphs 8 and 16, respectively, of that agreement.

## The State Farm Complaint

21. State Farm, as subrogee of the Sharps, filed its Complaint on November 10, 2021, wherein it alleges it issued an unspecified "policy of insurance" to the Sharps, pursuant to which it paid the Sharps an amount exceeding $800,000 for damages following the explosion of the Sharps' home. A true and correct copy of the State Farm Complaint is attached hereto as **Exhibit 2**.

22. The underlying facts relating to the home explosion which gives rise to State Farm's claims are the same as those set forth within the Sharps' Complaint. *See* **Exhibit 2** at ¶¶ 6–29.

23. As it relates to AHS, State Farm alleges that AHS negligently failed to ensure that Tenney's had the proper qualifications, was properly trained to safely service home appliances, or had properly trained its employees, such as Mr. Ruppenthal. **Exhibit 2** at ¶¶ 49–52.

24. State Farm, however, also alleges AHS breached the home warranty contract it entered into with the Sharps, which implicitly required AHS to utilize properly trained, experienced, and certified contractors who performed work in a safe and complete manner. **Exhibit 2** at ¶¶ 53–58.

25. Similar to the Sharps' Complaint, State Farm's allegations against AHS relate to Tenney's services and obligations, which are governed by the Master Services Agreement entered into between AHS and Tenney's and are subject to the insurance and indemnification provisions set forth in Paragraphs 8 and 16, respectively, of that agreement.

### AHS's Relationship with Tenney's

26. As indicated above, AHS is a home warranty company that provides home warranty plans to its customers covering the cost to repair and/or replace major home systems and appliances, subject to the limitations and exclusions set forth in the plan. It does so through contracts with independent service contractors that perform the repair or replacement work covered under these plans.

27. Tenney's is an independent service contractor that entered into a Master Services Agreement (the "MSA") with AHS on February 19, 2018. A true and correct copy of the MSA is attached hereto as **Exhibit 3**.

28. Under the MSA, AHS engaged Tenney's to provide ongoing repair services over the course of a one-year period beginning on February 19, 2018 with respect to any service or work order requests submitted to AHS under its home warranty plans. **Exhibit 3** at ¶¶ 1–2.

29. Following the initial one year term, the MSA automatically renewed for its first successive term on February 19, 2019 and remained in effect on the date of the explosion. *See* **Exhibit 3** at ¶ 15(a).

30. Under Paragraph 8 of the MSA, Tenney's was required to maintain commercial general liability insurance, among other forms of coverage, at all times while the MSA remained in effect. **Exhibit 3** at ¶ 8(a).

31. Specifically, the MSA required that Tenney's maintain commercial general liability insurance with a limit of not less than $250,000 per occurrence for contractual liability, independent contractor, property damage, bodily injury, liability assumed under an insured contract, products and completed operations, and premises coverage with a $500,000 aggregate. **Exhibit 3** at ¶ 8(a)(i).

32. Additionally, Tenney's and AHS entered into a Home Warranty Addendum on February 19, 2018, the purpose of which was to supplement the terms of the MSA. A true and correct copy of the Home Warranty Addendum is attached hereto as **Exhibit 4**.

33. The Home Warranty Addendum required an increase of the coverage limits originally set forth in the MSA in the event that Tenney's received a call volume commitment equal to or exceeding 500 calls annually. **Exhibit 4** at ¶ 10.

34. Specifically, Paragraph 10 of the Home Warranty Addendum required that Tenney's, should it receive a call volume commitment equal to or exceeding 500 calls annually, maintain commercial general liability insurance with a minimum of $500,000 per occurrence for bodily injury and property damage coverage with a $1,000,000 aggregate for general, products and completed operations coverage, including contractual liability, independent contractor, property damage, bodily injury, and premises coverage. **Exhibit 4** at ¶ 10(f).

35. Both the MSA and Home Warranty Addendum required that Tenney's name AHS and its subsidiaries as an additional insured under its coverage providing commercial general liability insurance. **Exhibit 3** at ¶ 8(a)(i)(C); **Exhibit 4** at ¶ 10(f)(i)(c).

36. The MSA also required that Tenney's, at least annually, and upon AHS's request or upon any insurance provider's change, amendment, cancellation, renewal, or modification, supply AHS with a certificate of insurance. **Exhibit 3** at ¶ 8(a).

37. With respect to Tenney's obligations in providing a certificate of insurance, the MSA further states the following:

> d) [Tenney's] shall supply AHS with a new certificate of insurance as coverages are renewed, amended, modified, canceled, terminated, or replaced.
>
> * * *
>
> f) All certificates of insurance shall provide for at least thirty (30) days written notice to AHS prior to the cancellation or material change of any insurance referred to in this Section 8. Failure of AHS to demand such certificates or other evidence of full compliance with these insurance requirements or failure of AHS to identify a deficiency from evidence that is provided shall not be construed as a waiver of Servicer's obligation to maintain such insurance.

**Exhibit 3** at ¶¶ 8(d)–(f).

38. Furthermore, Paragraph 8 of the MSA contains additional requirements, which include, but are not limited to:

> i. Requiring that all policies name AHS and its subsidiaries, parent and affiliated companies as additional insureds;
>
> ii. Requiring that all independent contractor technicians or subcontractors maintain the same types and amounts of insurance and be subject to the same requirements as Tenney's;
>
> iii. Requiring that all such policies be endorsed as primary coverage listing AHS coverage as excess insurance and non-contributory with AHS's own insurance;
>
> iv. Requiring that all policies be written on an occurrence-basis; and
>
> v. Requiring that policies be provided by carriers with an A.M. Best rating of at least A-.

**Exhibit 3** at ¶¶ 8(b)–(c).

39. In addition to these coverage requirements, Tenney's agreed to the indemnification provisions set forth in Paragraph 16 of the MSA, which states in its entirety as follows:

   a) To the fullest extent permitted by law, [Tenney's] agrees to indemnify, hold harmless, and defend, at [Tenney's] sole expense (including without limitation expenses, costs, and reasonable attorney's fees), AHS, its subsidiaries, parents, and affiliated companies, and the officers, agents, directors, shareholders, and employees of AHS and its subsidiaries, parents, and affiliated companies, against any and all third party commenced or threatened actions, investigations, claims, losses, liabilities, and/or damages (whether or not any indemnified party is a party thereto) alleged to have been incurred or caused, either directly or indirectly, by the negligent, unlawful, or willfully wrongful acts or omissions of [Tenney's] or any of [Tenney's] Associates or any other person acting on [Tenney's] behalf or associated with Servicer in relation to (1) any Dispatch, (2) any Services performed for any Program, (3) any Non-Covered/Additional Services, or (4) other matters in any way related to this Agreement or [Tenney's] relationship or interaction with AHS ("Claim"), except to the extent caused by the negligence or willful misconduct of AHS.

   b) If the resolution of any Claim is reasonably expected to have a significant adverse effect on AHS or if [Tenney's] fails to assume the defense of such Claim within fifteen (15) days after receipt of notice of a Claim, then AHS may elect, at its sole discretion, to control the defense, compromise, or settlement of such Claim (at [Tenney's] sole cost, risk, and expense); provided, however, that such Claim shall not be compromised or settled without the written consent of [Tenney's], which consent shall not be unreasonably withheld. If consent is unreasonably withheld, AHS may settle the Claim without such consent. If AHS assumes the defense of the Claim, AHS will keep [Tenney's] informed of the progress of any such defense, compromise, or settlement. [Tenney's] shall be liable for any settlement of any action effected in accordance with this paragraph and for any final judgment (subject to any right of appeal).

**Exhibit 3** at ¶¶ 16(a)–(b).

### The Certificate of Insurance and Coverage for AHS

40. Pursuant to its contractual obligations under the MSA and the Home Warranty Addendum, Tenney's obtained liability insurance through Erie for the work and services it provided to AHS and its customers.

41. As required by the MSA, Erie provided AHS with a copy of the Certificate of Insurance, issued July 9, 2019, which lists AHS as the certificate holder. A true and correct copy of this Certificate of Insurance is attached hereto as **Exhibit 5**.

42. Through the Certificate of Insurance, Erie represented to AHS that Tenney's held commercial general liability insurance coverage in accordance with the terms and conditions set forth under the MSA.

43. Specifically, the Certificate of Insurance provides that Erie issued to Tenney's Policy Number Q326320095 providing commercial general liability insurance coverage, effective from August 13, 2019 through August 13, 2020 (the "Erie Policy"). A true and correct copy of the Erie Policy is attached hereto as **Exhibit 6**.

44. At all times prior to and on the date of the explosion, AHS reasonably relied upon the representations of coverage made by Erie in the Certificate of Insurance.

45. As it relates to the Erie Policy, the Insuring Agreement of Coverage A of the Commercial General Liability Coverage Form ("CGL Coverage Form") provides, in pertinent part:

> **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **1. Insuring Agreement**
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.
>
> \* \* \*
>
> b. This insurance applies to "bodily injury" and "property damage" only if:

    1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

    2) The "bodily injury" or "property damage" occurs during the policy period; and

    3) Prior to the policy period, no insured listed under Paragraph **1**. of Section **II** – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.

*See* **Exhibit 6**.

    46. The CGL Coverage Form provides the following definitions in SECTION V – DEFINITIONS, pertinent to the foregoing:

    3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\* \* \*

    9. "Insured contract" means:

    f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

\* \* \*

    13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

    17. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*See* **Exhibit 6**.

47. The Additional Insured – Owners, Lessees, or Contractors – Automatic Status When Required In Construction Agreement With You Endorsement (hereinafter, the "Additional Insured Endorsement") modifies the insurance provided under the CGL Coverage Form of the Erie Policy, providing enhanced coverage in various ways.

48. In pertinent part, the Additional Insured Endorsement amends SECTION II – WHO IS AN INSURED of the CGL Coverage Form as follows:

> **A. Section II – Who Is An Insured** is amended to include as an additional insured:
>
> 1. Any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy; and
>
> 2. Any other person or organization you are required to add as an additional insured under the contract or agreement described in Paragraph 1. above.
>
> Such person(s) or organization(s) is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:
>
> a. Your acts or omissions; or
> b. The acts or omissions of those acting on your behalf;
>
> in the performance of your ongoing operations for the additional insured.

*See* **Exhibit 6**.

49. The Additional Insured Endorsement further provides that "[a] person's or organization's status as an additional insured under this endorsement ends when your operations for the person or organization described in Paragraph 1. above are completed." *See* **Exhibit 6**.

50. The Additional Insured Endorsement is a "blanket" endorsement in that automatically confers additional insured status to another party when required under a contract or agreement.

51. Pursuant to the Additional Insured Endorsement, AHS is an additional insured under the CGL Coverage Form of the Erie Policy with respect to liability arising out of Tenney's work and services performed under the MSA, as evidenced by the Certificate of Insurance.

52. At all relevant times, AHS was an additional insured, and the claims at issue in the Underlying Actions trigger the Insuring Agreement under the CGL Coverage Form of the Erie Policy.

53. As an additional insured, AHS stands in the same shoes as Tenney's with respect to its rights under the Erie Policy.

54. Further, under Paragraph 16 of the MSA, Tenney's agreed to indemnify, hold harmless, and defend AHS from and against any and all claims, losses, liabilities, and/or damages alleged to have been incurred or caused by the negligent, unlawful, or willfully wrongful acts or omissions of Tenney's, its associates, or those acting on its behalf, thereby triggering the Insuring Agreement under the CGL Coverage Form of the Erie Policy.

### Erie's Duty to Defend and Indemnify AHS

55. Following the explosion, AHS, through its insurer's claim administrator, submitted a letter, dated November 13, 2019, to Tenney's requesting that Erie defend and indemnify it from and against the Sharps' claims arising out of the home explosion. A true and correct copy of this letter is attached hereto as **Exhibit 7.**

56. By letter dated January 16, 2020, Erie denied AHS's tender on the basis that the policy providing coverage to Tenney's was cancelled with an effective date of October 18, 2019. A true and correct copy of this letter is attached hereto as **Exhibit 8**.

57. According to Erie, because the loss occurred after the policy was cancelled and outside the policy period, there is no coverage for the claim. *See* **Exhibit 8**.

58. On July 14, 2023, following Erie's denial of AHS's tender, AHS served a Civil Case Subpoena upon Erie seeking, among other items, "[a]ny and all documents related to the cancellation of Policy No. Q32-6320095," and "[a]ny and all notices of the cancellation of Policy No. Q32-6320095 provided to American Home Shield."

59. In response to this subpoena, Erie produced cancellation notices advising Tenney's that the Erie Policy would be effectively cancelled on October 18, 2019 as a result of non-payment of premium.

60. While Erie produced cancellation notices it provided to Tenney's, there is no record of any cancellation notice provided to AHS. Indeed, Erie never provided notice of the cancellation to AHS.

61. The MSA required that "[a]ll certificates of insurance shall provide for at least thirty (30) days written notice to AHS prior to the cancellation or material change of any insurance" maintained under its terms. *See* **Exhibit 3** at ¶ 8(f).

62. Despite the fact that AHS is an additional insured, Erie failed to provide any notice to AHS that Erie Policy would be or was effectively cancelled on October 18, 2019 prior to the explosion giving rise to the Underlying Actions.

63. Accordingly, AHS reasonably relied upon the Certificate of Insurance and Erie's representation therein providing that the Erie Policy would be in effect throughout the term of the MSA.

64. AHS reasonably relied upon this representation to its detriment as it allowed Tenney's to perform work under the MSA without adequate insurance coverage.

65. By letter dated September 29, 2023, AHS, through counsel, renewed its request that Erie defend and indemnify it from and against the Sharps' claims arising out of the home explosion. A true and correct copy of this letter is attached hereto as **Exhibit 9**.

66. On November 17, 2023, Erie again rejected AHS's tender and denied its request for a defense and indemnification. A true and correct copy of this letter is attached hereto as **Exhibit 10**.

67. In denying AHS's tender, Erie maintained that the Erie Policy was canceled with an effective date of October 18, 2019 and that there is no coverage for this loss as the damages occurred after the policy was cancelled. *See* **Exhibit 10**.

68. Erie further contended in its letter that AHS was not specifically named and/or scheduled on the policy and therefore would not have a received a cancellation notice from Erie. *See* **Exhibit 10**.

69. Contrary to Erie's stated reasons for denying coverage, the Additional Insured Endorsement automatically renders AHS an additional insured by way of the terms of the MSA, thereby eliminating the need to issue separate additional insured endorsements or specifically name and/or schedule AHS as an additional insured on the policy. AHS's status as an additional insured is further evidenced by the Certificate of Insurance.

70. Ultimately, Erie's sole basis for denying AHS's tender is that the policy was cancelled with an effective date of October 18, 2019, and that there is no coverage for this loss as the damages occurred on November 11, 2019. **Exhibit 8**; **Exhibit 10**.

71. As a direct result of Erie's wrongful claims decision, AHS has been forced to incur attorneys' fees and costs to defend against the claims asserted against it by the Sharps and State Farm in the Underlying Actions.

72. As a result, AHS is forced to bring this Complaint.

## COUNT I – BREACH OF CONTRACT
### (Erie)

73. Paragraphs 1 through 72 of this Complaint are incorporated herein by reference and are realleged as if fully set forth herein.

74. The policy issued by Erie represents a written contract, and as an additional insured under this policy, AHS is entitled to receive the benefits provided by this contract, including the obligation of Erie to defend and indemnify it with regard to the Sharps' claims in the Underlying Actions.

75. Despite AHS's demands, Erie has breached these contractual duties by failing to defend or indemnify AHS in relation to the Sharps' claims.

76. As a result, AHS has suffered and will continue to suffer damages, including monetary losses, annoyance, inconvenience, aggravation, and attorneys' fees and expenses.

## COUNT II – UNFAIR TRADE PRACTICES
### (Erie)

77. Paragraphs 1 through 76 of this Complaint are incorporated herein by reference and are realleged as if fully set forth herein.

78. Under W. Va. Code § 33-11-4(1)(a), it is an unfair method of competition and an unfair or deceptive act or practice in the business of insurance for a person to make a misrepresentation concerning the benefits, advantages, conditions or terms of any insurance policy.

79. Under W. Va. Code § 33-11-4(9)(a), it is an unfair method of competition and an unfair or deceptive act or practice in the business of insurance for a person to misrepresent pertinent facts or insurance policy provisions relating to coverages at issue.

80. Under W. Va. Code § 33-11-4(9)(b), it is an unfair method of competition and an unfair or deceptive act or practice in the business of insurance for a person to fail to acknowledge and act promptly upon communications with respect to claims arising under insurance policies.

81. Under W. Va. Code § 33-11-4(9)(c), it is an unfair method of competition and an unfair or deceptive act or practice in the business of insurance for a person to fail to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

82. Under W. Va. Code § 33-11-4(9)(d), it is an unfair method of competition and an unfair or deceptive act or practice in the business of insurance for a person to refuse to pay claims without conducting a reasonable investigation based upon all available information.

83. Under W. Va. Code § 33-11-4(9)(e), it is an unfair method of competition and an unfair or deceptive act or practice in the business of insurance for a person to fail to affirm or deny coverage of claims within a reasonable time.

84. Under W. Va. Code § 33-11-4(9)(g), it is an unfair method of competition and an unfair or deceptive act or practice in the business of insurance for a person to compel insureds to institute litigation to recover amounts due under an insurance policy.

85. Under W. Va. Code § 33-11-4(9)(n), it is an unfair method of competition and an unfair or deceptive act or practice in the business of insurance for a person to fail to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

86. The conduct of Erie constitutes unfair or deceptive acts or practices in violation of the provisions of the West Virginia Unfair Trade Practices Act, W. Va. Code 33-11-4, as detailed in the paragraphs above.

87. As a result of Erie's misrepresentations and omissions and unfair or deceptive acts or practices, AHS has been injured and has suffered damages in an amount to be determined, including, but not limited to monetary losses, annoyance, inconvenience, aggravation, and attorneys' fees and expenses.

### COUNT III – NEGLIGENT MISREPRESENTATION
### (Erie)

88. Paragraphs 1 through 87 of this Complaint are incorporated herein by reference and are realleged as if fully set forth herein.

89. The MSA and Home Warranty Addendum both clearly and unambiguously states that Tenney's shall name AHS and its subsidiaries as an additional insured under its coverage providing commercial general liability insurance.

90. The Certificate of Insurance provided to AHS clearly and unambiguously identifies AHS as the certificate holder and an additional insured under the Erie Policy, effective from August 13, 2019 to August 13, 2020.

91. As Erie has denied AHS's tender and request for a defense and indemnification against the claims asserted by the Sharps and State Farm in the Underlying Actions, the statements of coverage contained in the Certificate of Insurance represents a material misrepresentation as to the benefits available to AHS as an additional insured under the Erie Policy, as identified on the Certificate of Insurance.

92. Prior to the explosion go November 11, 2019, Erie never provided notice to AHS that the insurance reflected on the Certificate of Insurance had been cancelled.

93. AHS relied upon this misrepresentation contained in the Certificate of Insurance to its detriment by allowing Tenney's to perform work under the MSA without adequate insurance coverage.

94. As a result of Erie's material misrepresentations, AHS has been injured and has suffered damages in an amount to be determined, including, but not limited to monetary losses, annoyance, inconvenience, aggravation, and attorneys' fees and expenses.

## COUNT IV – DECLARATORY JUDGMENT
### (Erie)

95. Paragraphs 1 through 94 of this Complaint are incorporated herein by reference and are realleged as if fully set forth herein.

96. Erie has wrongfully denied its obligations to defend and indemnify AHS as an additional insured under the Erie Policy with regard to the Sharps and State Farm's claims against AHS in the Underlying Actions.

97. A justiciable controversy exists between the parties to this action with respect to the scope, meaning, and application of the Erie Policy and whether Erie owes a duty of defense and a duty of indemnification to AHS.

98. The legal rights and obligations of the parties to this action are dependent upon this Court's declaration of the scope, meaning and application of the Erie Policy, and to the extent that issues of fact impact such scope, meaning, and application of the Erie Policy presented in this civil action, a jury in the Northern District of West Virginia must make such findings of fact.

99. AHS asks that the Court declare that, under the terms of the Erie Policy and as a result of the Certificate of Insurance issued to AHS, Erie is legally obligated to provide a defense to AHS in reference to the claims made against AHS in the Underlying Actions.

100. AHS also asks that the Court declare that, under the terms of the Erie Policy and as a result of the Certificate of Insurance issued to AHS, Erie is legally obligated to indemnify AHS in reference to the claims made against AHS in the Underlying Actions.

WHEREFORE, AHS prays for relief against Erie on all counts set forth in this Complaint for Declaratory Judgment, including but not limited to the following specific relief:

A. An Order granting declaratory relief pursuant to Declaratory Judgment Act, 28 U.S.C. § 2201, and declaring that Erie owes AHS a duty to defend and a duty of indemnification for all claims asserted against AHS in the Underlying Actions;

B. An Order finding that Erie acted negligently, willfully, wantonly, recklessly, and maliciously in its handling of AHS's claims;

C. An Order finding that Erie violated the West Virginia Unfair Trade Practices Act with such frequency as to constitute a general business practice;

D. An award for damages in an amount to be determined, including, but not limited to monetary losses, annoyance, inconvenience, aggravation, and attorneys' fees and expenses, and punitive damages; and

E. Any such other and further relief as this Court deems just and proper.

To the extent that any material factual issues exist for any of the causes of action contained herein, AHS requests a JURY TRIAL.

Respectfully Submitted,

**AMERICAN HOME SHIELD CORPORATION**

**BY SPILMAN THOMAS & BATTLE, PLLC**


*/s/ Joseph A. Ford*
Joseph A. Ford (WV State Bar No. 12984)

*/s/ Jonathan A. Deasy*
Jonathan A. Deasy (WV State Bar No. 13802)

SPILMAN THOMAS & BATTLE, PLLC
300 Kanawha Boulevard, East
Charleston, WV  25321
jford@spilmanlaw.com
jdeasy@spilmanlaw.com